

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00457-CV

———————————————

IN THE MATTER OF A.F.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-121996-23

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant A.F. (Arnold)[1] is accused of committing capital murder when he was 15 years old by shooting and attempting to rob his Lyft driver. *See* Tex. Penal Code Ann. § 19.03(a)(2). He appeals the juvenile court's order waiving its jurisdiction and transferring his case to the criminal courts for his prosecution as an adult.[2] *See* Tex. Fam. Code Ann. §§ 54.02(a), 56.01(c)(1)(A), (h-1). In his sole appellate issue, Arnold claims that the transfer order was an abuse of the juvenile court's discretion because "the weight of the evidence" regarding his sophistication and maturity "established [that] TJJD[3] was the best placement option" for him. *See id.* § 54.02(f) (requiring consideration of four factors, including "the sophistication and maturity of the child"). Because we reject the merits of his argument as well as the implied premises upon which it is based, we will affirm.[4]

## I. Governing Law

A juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if,

---

[1]We use a pseudonym to protect the juvenile's identity. *See* Tex. Fam. Code Ann. § 56.01(j); Tex. R. App. P. 9.8(c).

[2]When the transfer order was signed, Arnold was 16 years old.

[3]TJJD refers to the Texas Juvenile Justice Department.

[4]This interlocutory appeal is subject to an accelerated, 180-day deadline for disposition. Tex. R. Jud. Admin. 6.2(a)

2

among other things, "the juvenile court determines [1] that there is probable cause to believe that the child before the court committed the offense alleged and [2] that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings." *Id.* § 54.02(a)(3); *see In re T.S.*, No. 02-20-00353-CV, 2021 WL 733305, at *2 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.). The State has the burden to persuade the juvenile court to transfer the case by a preponderance of the evidence. *In re C.F.*, No. 02-22-00195-CV, 2022 WL 4545566, at *1 (Tex. App.—Fort Worth Sept. 29, 2022, no pet.) (mem. op.). In deciding whether a preponderance of the evidence supports the second requirement, the juvenile court must consider four nonexclusive statutory factors: (1) "whether the alleged offense was against person or property"; (2) the record and previous history of the juvenile; (3) "the prospects of adequate protection of the public and the likelihood of the [juvenile's] rehabilitation" through the juvenile-justice system; and (4) the juvenile's "sophistication and maturity."[5] Tex. Fam. Code Ann. § 54.02(f); *see C.F.*, 2022 WL 4545566, at *1; *In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at *19 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.); *T.S.*, 2021 WL 733305, at *2. "[A]ny combination of these [factors] may suffice to support a waiver of jurisdiction and transfer." *C.F.*, 2022 WL 4545566, at *1 (citing *A.K.*, 2021 WL 1803774, at *19).

---

[5]We have reordered the statutory factors to match the sequence of our analysis.

## II. Standard of Review

Generally, a juvenile court's transfer order is subject to a two-pronged review: first we review the juvenile court's specific fact-findings under the traditional evidentiary-sufficiency standards, then we review the juvenile court's transfer decision for an abuse of discretion. *In re J.D.*, No. 02-23-00177-CV, 2023 WL 6152620, at *4 (Tex. App.—Fort Worth Sept. 21, 2023, pet. denied) (mem. op.); *A.K.*, 2021 WL 1803774, at *18.

If the juvenile court's findings are challenged for factual insufficiency, we consider all evidence presented to determine if the challenged findings are against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *A.K.*, 2021 WL 1803774, at *18; *T.S.*, 2021 WL 733305, at *3.

As for whether the transfer decision was an abuse of discretion, a juvenile court abuses its discretion if, in light of the evidence presented, the decision is arbitrary or made without reference to the statutory criteria. *J.D.*, 2023 WL 6152620, at *4; *C.F.*, 2022 WL 4545566, at *1; *A.K.*, 2021 WL 1803774, at *18; *T.S.*, 2021 WL 733305, at *3. Because the juvenile court sits as factfinder and evaluates the witnesses in person, it is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *T.S.*, 2021 WL 733305, at *3. The juvenile court may resolve conflicts in the evidence, and as long as its transfer decision is supported by some substantive and probative evidence and reflects "a reasonably principled application of the legislative criteria," it is not an abuse of discretion. *C.F.*, 2022 WL 4545566, at *1–2.

4

### III.  Discussion

Arnold argues that the juvenile court abused its discretion by transferring his case because the weight of the evidence—specifically, the evidence of his immaturity and lack of sophistication, one of the four statutory factors—showed that he "would be better served by . . . being adjudicated through the juvenile system."  This argument is flawed.

### A.  Arnold's best interest is not the question.

First, the juvenile court was not asked to determine whether Arnold would be "better served" by the juvenile-justice system.  Rather, the juvenile court was asked to determine whether "the welfare of the community requires criminal proceedings" and to consider whether the juvenile-justice system could provide "adequate protection [for] the public and [a] likelihood of [Arnold's] rehabilitation."  Tex. Fam. Code Ann. § 54.02(a)(3), (f)(4).  Arnold's best interest was not the question, so even if Arnold "would be better served" by the juvenile system, that would not have made the juvenile court's transfer order an abuse of discretion.  We overrule Arnold's issue to the extent that it relies on this faulty premise.

### B.  Not every statutory factor need favor transfer.

Another faulty premise seemingly underlying Arnold's appellate argument is his claim that the "weight of the evidence" was against transfer based on just one of the four statutory factors:  according to Arnold, the evidence showed that his "immaturity

and sophistication would be better served by him being adjudicated through the juvenile system."

But even if the evidence of Arnold's "sophistication and maturity" weighed against transfer, that would not necessarily have made transfer an abuse of discretion, as there are four statutory factors, *id.* § 54.02(f)(2), and no one factor is vital to the juvenile court's decision so long as there is sufficient evidence overall. *J.D.*, 2023 WL 6152620, at *4 (noting that juvenile court "does [not] need to find that the evidence establishes each factor"); *A.K.*, 2021 WL 1803774, at *23 n.19 ("[T]here need not be evidence in support of every Section 54.02(f) factor weighing in favor of transfer, so long as there is sufficient overall evidence to justify the juvenile court's decision."); *In re C.A.P.*, 582 S.W.3d 504, 508 (Tex. App.—Waco 2018, pet. denied) ("The juvenile court must consider all four factors under Section 54.02(f), but it need not find that all four factors favor transfer when exercising its discretion to waive jurisdiction."). Although the juvenile court was required to consider Arnold's sophistication and maturity, *see* Tex. Fam. Code Ann. § 54.02(f)(2), and although its transfer order recited that it had done so, "[n]othing in the statute elevates this prong any higher than the other factors that the juvenile court must consider." *A.K.*, 2021 WL 1803774, at *23 n.19.

Arnold does not address the other three statutory factors, he does not claim that the evidence was factually insufficient to weigh those factors in favor of transfer, and he does not explain why his alleged immaturity overshadowed the evidence

6

supporting transfer so as to make the juvenile court's order an abuse of discretion. To the extent that Arnold's sufficiency challenge relies on the assumption that the juvenile court could not order transfer unless the sophistication-and-maturity factor supported it, i.e., that an error "on the sophistication-and-maturity prong c[ould ]not be harmless," this court has rejected that premise in the past, and we do so again here. *See id.* (rejecting implied argument that allegedly insufficient evidence "on the sophistication-and-maturity prong cannot be harmless" when appellant challenged sufficiency of only that prong); *T.S.*, 2021 WL 733305, at *9 (noting that "the trial court was not required to make a finding regarding the likelihood of [the juvenile's] rehabilitation in order to transfer his case" because "the trial court's findings on the three other factors . . . which [the juvenile] d[id] not contest the sufficiency of, [we]re sufficient to support . . . transfer").

**C.     Factually sufficient evidence supported transfer, so there was no abuse of discretion.**

Even liberally construing Arnold's brief as challenging the juvenile court's discretion to order transfer based on the sufficiency of the evidence overall, a principled application of the statutory factors shows that the great weight of the evidence—of each factor and overall—supported transfer.

**1.     Factor 1:  Offense Against the Person**

Capital murder is an offense against the person—the first statutory factor. *See* Tex. Fam. Code Ann. § 54.02(f)(1); Tex. Penal Code Ann. §§ 19.03(a)(2) (defining

7

offense of capital murder within Title 5 of the Penal Code), 19.01–22.12 (entitling Title 5 "Offenses Against the Person"). And there was ample evidence to support a finding of probable cause that Arnold not only committed this offense against the person but that he did so by killing an innocent, seemingly random stranger. *See* Tex. Fam. Code Ann. § 54.02(a)(3), (f)(1).

The officer who investigated the murder testified that, on the night of July 4, 2022, the victim—a man in his sixties—was found in the driver's seat of his car with a gunshot wound to his head.[6] The officer found a 40-caliber cartridge casing in the vehicle, and two witnesses told him that they had observed "a black male and a black female exit from the rear of the vehicle" and "run away."[7]

The officer later learned that the victim had been driving for Lyft that night, and using data from the victim's phone and information from Lyft, he was able to identify the victim's final Lyft customer:[8] C.W. (Courtney).[9] When the police interviewed Courtney, she admitted that she had ordered a Lyft to go to a block party,

---

[6]The victim initially survived, but he later succumbed to his gunshot wound and died.

[7]Surveillance video was consistent with the witnesses' statements.

[8]Lyft noted that the name and phone number associated with the account had been changed on the night of the murder. Later, it was determined that the changes were made approximately 20 minutes after the murder.

[9]Although the record suggests that Courtney was an adult when the murder occurred, we refer to her using a pseudonym out of an abundance of caution.

8

and she stated that the person riding with her had pulled out a gun, demanded the driver's vehicle, then shot the driver in the head. Courtney initially named a female as the shooter,[10] but later, she admitted that Arnold was the shooter.

Further investigation revealed that Courtney and Arnold had been dating,[11] and digital records corroborated several details of Courtney's story, including her statements that they had been seeking a ride to the block party that night and that they had visited Arnold's aunt's house after the murder.

Courtney also notified the police that, a few hours before the murder, Arnold had photographed himself "holding the weapon that was used in the offense" and that he had posted the photograph on Instagram. The police recovered the photograph from Instagram, and they further discovered Instagram messages in which Arnold had attempted to sell a 40-caliber gun just a few days after the murder.

Although Arnold initially denied any connection to the murder, he later admitted to being with Courtney that night and riding in the victim's Lyft. Arnold claimed, though, that Courtney "did everything": that she had the gun, she planned the robbery, she shot the driver, and she used his Instagram account to sell her gun.

---

[10]The female that Courtney initially identified as the shooter had been in custody at the time of the murder. Courtney later told the police that she had lied because she was scared of Arnold.

[11]The police discovered a romantic photo of Arnold in Courtney's room, and they observed her making frequent calls to Arnold's mother's phone number.

Arnold concedes that the above evidence was sufficient to support "the juvenile court['s] determin[ation] that there [wa]s probable cause to believe that [Arnold] committed the offense alleged" and that the capital murder was committed "against [a] person." *See id.* § 54.02(a)(3), (f)(1). By statute, "greater weight in favor of transfer [is] given to offenses against the person." *Id.* § 54.02(f)(1). Particularly in light of the "seriousness of the offense" committed against the person—Arnold's allegedly murdering a random stranger while the stranger was providing him a service on a holiday—the juvenile court had factually sufficient evidence to weigh this factor heavily in favor of transfer. *See id.* § 54.02(a)(3), (f)(1).

### 2. Factor 2: Record and History

There was also evidence that this was not Arnold's first weapons-related incident—another statutory consideration. *See id.* § 54.02(f)(3). In fact, when the murder occurred, Arnold was three months into a six-month probation for unlawful carrying of a weapon. His juvenile probation officer testified that, in the unlawful-carrying incident, an individual had been shot in the leg, and Arnold had been found with a gun tucked inside his clothing.

The probation officer described another weapons-related incident that Arnold had been involved in as well. A few weeks after the alleged murder, and while Arnold was still on probation, he was shot in a dispute over a female. And of course, Arnold had photographed himself with a gun on the night of the murder, while he was still on probation for unlawful carrying of a weapon.

10

Given Arnold's record of unlawfully carrying a weapon and his history of gun-related incidents, the juvenile court had factually sufficient evidence to weigh "the record and previous history of [Arnold]" in favor of transfer. *See id.*

### 3. Factor 3: Public Safety and Rehabilitation[12]

Arnold's behavior during his probation also shed light on the third statutory factor: the likelihood of his rehabilitation and the threat to the public if the case remained in the juvenile system. *See id.* § 54.02(f)(4). As part of Arnold's six-month probation for unlawful carrying of a weapon, he received a rehabilitative "wraparound service" that included electronic monitoring, therapy, and community service. Although he had completed some of these services, Arnold's probation officer testified that he had "struggled" with other probation requirements, that he had not completed the required community-service hours, that he had missed appointments, that he had failed to attend school, and that he had tested positive for marijuana at least twice.[13] Plus, it was during Arnold's time on probation—while he was actively receiving rehabilitative services—that he allegedly committed capital murder. The probation officer thus stated that the juvenile system had "exhausted all of [its]

---

[12]In a single sentence in the argument portion of his brief, Arnold alleges that "there were sufficient safeguards in place for the public and a high probability of rehabilitation for [Arnold] by use of procedures, services, and facilities currently available to the juvenile court." He does not elaborate on this statement or explain what evidence supports his position.

[13]The probation officer testified that Arnold had tested positive twice, but the psychologist's records indicated that Arnold had tested positive four times.

11

services for [Arnold]." He did not recommend further probation for Arnold and opined that the only option left was confinement.

The psychologist who had forensically evaluated Arnold testified to the contrary. She opined that Arnold could participate in rehabilitation because she was not aware of him having "been aggressive with any authority figures." She admitted, though, that she had not taken the capital murder into account in her evaluation, and when taking the murder into account, she conceded that Arnold "was a high risk to potentially harm people again" and was "at risk to commit some sort of violent act in the future."

The juvenile court, as the sole judge of the witnesses' credibility and the weight to be given each witness's testimony, was free to believe the probation officer's testimony that Arnold was not amenable to rehabilitation. *See T.S.*, 2021 WL 733305, at *8 (recognizing that, as the factfinder, "the juvenile court's role was to evaluate the witnesses, judge their credibility, determine who to believe or disbelieve, and weigh the evidence and any inconsistencies"). Given the evidence of Arnold's gun-related incidents and alleged commission of murder while on probation, the juvenile court could have rationally concluded that the juvenile-justice system's services were inadequate to protect the public. There was thus factually sufficient, probative evidence that this factor weighed in favor of transfer. *See* Tex. Fam. Code Ann. § 54.02(f)(4).

12

### 4. Factor 4: Sophistication and Maturity

The same is true of the statutory factor that Arnold challenges on appeal: his sophistication and maturity. *See id.* § 54.02(f)(2). Although Arnold claims that this factor weighed against transfer, there was conflicting evidence, and the juvenile court was free to resolve the conflict by believing the evidence in favor of transfer. *See T.S.*, 2021 WL 733305, at *8.

The purpose of inquiring into a juvenile's sophistication and maturity "is to determine whether he appreciates the nature and effect of his voluntary actions and whether they were right or wrong." *A.K.*, 2021 WL 1803774, at *19. Here, the psychologist testified that Arnold had a "very limited" ability to think abstractly, that he was slower than his peers to process new information, and that he was vulnerable to manipulation. She expressed concern about Arnold being adjudicated as an adult due to his "overall IQ," his "verbal abilities," and "his [in]ability to think abstractly."

But the psychologist's report—which was admitted into evidence—stated that Arnold "d[id] not have a mental illness or an intellectual disability which substantially impair[ed] his capacity to understand the allegations against him . . . and to assist in his own defense." And the State presented evidence that Arnold had the maturity to appreciate the crime he had allegedly committed and the sophistication to try to avoid blame. It showed that Arnold had fled the scene of the crime, had attempted to sell his gun after the offense, had initially denied involvement, and had later blamed the murder on Courtney. The juvenile court noted as much, explaining at the end of the

13

transfer hearing that "[t]he amount of planning that went into this offense, the seriousness of the offense, and [Arnold's] efforts to escape culpability of this offense [we]re not consistent with what juveniles do, [but were] very consistent with adult criminal behavior."

In other words, although Arnold is correct that there was evidence of his immaturity and lack of sophistication, that evidence was controverted and "subject to interpretation by the juvenile court." *See C.F.*, 2022 WL 4545566, at *7 (affirming transfer order when 16-year-old allegedly committed capital murder and other crimes and noting that juvenile court could resolve conflicts in evidence related to the juvenile's sophistication and maturity). Much like in *C.F.*,[14] the psychologist's testimony regarding the juvenile's alleged immaturity and low IQ conflicted with the evidence that he had "demonstrated sophistication through his actions," including his "efforts to try to shift blame from himself and to avoid the consequences of his actions." *See id.* at *6–7 (rejecting argument that transfer was abuse of discretion when there was conflicting evidence of maturity and amenability to rehabilitation, even though psychologist testified that juvenile had a low IQ, that he was immature, and that he would likely benefit from juvenile-justice services). As we held there, the juvenile court was the sole judge of the witnesses' credibility, and it had the discretion to resolve the conflicts in the evidence in favor of transfer. *See id.* at *7.

---

[14]Significant portions of Arnold's appellate brief are nearly identical to the brief filed for the appellant in *C.F.*

14

**5.      Overall:  Sufficient Evidence; No Abuse of Discretion**

Ultimately, then, factually sufficient evidence of the four statutory factors supported the juvenile court's conclusion that, based on "the seriousness of the offense alleged [and] the background of the child[,] the welfare of the community require[d] criminal proceedings."  *See* Tex. Fam. Code Ann. § 54.02(a)(3), (f).  The juvenile court was not required to deny transfer simply because the psychologist testified that Arnold was unsophisticated and immature.  Because there was probative, factually sufficient evidence to support the juvenile court's transfer decision, and because that decision reflected a principled application of the statutory factors, the juvenile court did not abuse its discretion.  *See C.F.*, 2022 WL 4545566, at *1–2, 7.  We overrule Arnold's sole issue.

## IV.  Conclusion

Having overruled Arnold's sole issue, we affirm the juvenile court's transfer order.  *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  February 22, 2024

15